UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v.   : | Criminal No. 1:23-cr-00219 (DLF) |
| : | |
| LONG DUONG : | |
| : | |
| and : | |
| : | |
| JULIE MILLER, : | |
|             Defendants.   : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Long Duong to 60 days of incarceration followed by one year of supervised release, and that it sentence Defendant Julie Miller to 14 days of incarceration followed by one year of supervised release. For both Miller and Duong, the government also requests that this Court impose 60 hours of community service, and consistent with the plea agreements in this case, $500 in restitution.

**I.    Introduction**

Long Duong, a 55-year-old machinist, and Julie Miller, a 51-year-old nail technician at a spa, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.

1

Both Duong and Miller pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds. As explained herein, sentences of incarceration are appropriate because both defendants: (1) ignored numerous and obvious warning signs that they should not enter the U.S. Capitol; (2) remained inside a private office while it was being ransacked by other rioters; and (3) despite being pushed out of the Capitol by police, chose to enter the Capitol building a second time. The two defendants' conduct on January 6 was nearly identical, but the government is recommending a longer sentence for Duong because of his extensive criminal history, which includes convictions for manslaughter, larceny, breaking and entering, and assault and battery with a dangerous weapon.

The Court must also consider that Duong's and Miller's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the U.S. Capitol building and disrupt the proceedings. Here, the facts and circumstances support a sentence of 60 days of incarceration for Duong and 14 days of incarceration for Miller.

**II.    Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summaries of the attack on the U.S. Capitol, filed in connection with Duong's and Miller's guilty pleas. *See* ECF 25 & 26 (Statement of Offense) ¶¶ 1–7.

***Duong's and Miller's Role in the January 6, 2021 Attack on the Capitol***

Duong and Miller traveled to Washington, D.C. from Worcester, Massachusetts. The two were housemates, and according to their accounts, they drove together by car to a hotel in Virginia as part of a road trip to visit the Eden Center, a Vietnamese shopping center located in Falls Church,

Virginia, and to test out a vehicle that Miller had recently purchased. Both purportedly learned about the "Stop the Steal" rally from other travelers in their hotel lobby. Duong and Miller decided to attend the rally, and on January 6, they drove from the hotel into D.C. and parked near the Washington Monument. Miller and Duong purchased and then kitted themselves up with Trump-emblazoned merchandise, including hats, and for Duong, a Trump sweatshirt and blue Trump flag that he draped over his backside.

Duong and Miller listened to the former President's speech near the Ellipse. After the speech, Duong and Miller walked with the crowd towards the U.S. Capitol. They walked up the Northwest Staircase and to the Upper West Terrace, where they observed the chaos created by the rioters and took photographs as souvenirs. They watched rioters commandeer a service lift and fly Trump flags from it as the crowd below cheered. Duong is circled in red and Miller is circled in yellow in the public source images below.

 

*Image 1: Duong and Miller followed the crowd up the Northwest Staircase.*
*Image 2: Miller and Duong watched rioters commandeer a service lift.*

3

Standing outside the entrance to the Senate Fire Door, Duong and Miller could hear rioters encouraging those standing directly by the door to "break the window" (Exh. 1 at 00:10) and could hear the crowd cheer when the door was actually breached. (Exh. 1 at 00:35). After the Senate Fire Door was breached, the crowd began to chant, "USA, USA" and Miller joined in the chanting. (Exh. 1 at 00:54 - 1:08). Duong and Miller watched rioters enter the Senate Fire Door, and then walked over and queued to enter the Capitol building at approximately 2:57 p.m. As they entered, they could hear shouting and alarms blaring in the background. (Exh. 2 at 2:10- 2:40).



*Image 3: Duong and Miller entered the Parliamentarian's Office Suite*

Immediately upon entering the Capitol building, Duong and Miller turned and entered the Parliamentarian's Office Suite. Stepping past the threshold, they could see the office had been ransacked, as papers were scattered across the floor and furniture was toppled over. Miller expressed surprise upon seeing the destruction, and filming as she entered, stated, "oh, my God." (Exh. 2 at 3:06). An unknown person said, "Don't destroy anything," and Miller responded, "They already did. Everything is already destroyed." The destruction did not cause either Duong or

4

Miller to turn around and go back; instead, they ventured further into an interior office space, where Miller sat in a chair as Duong took videos of her on his phone. (Exh. 2 at 4:10).

 

*Image 4: Miller took photos of the destruction in the Parliamentarian's Office Suite.*
*Image 5: Duong took a video of Miller sitting in an office chair. (Ex. 2 at 3:00-4:15)*

Miller and Duong lingered in the office space for roughly five minutes. In CCTV footage, it was clear that police had been engaged in efforts to clear the immediately adjacent hallway for several minutes, and Duong and Miller only left because they were pushed out of the office and out of the Fire Door by the police.



*Image 6: Miller and Duong were pushed out of the Capitol at roughly 3:02 p.m.*
*(Exh. 3 at 1:45-1:50)*

5

After exiting the Capitol building, Duong and Miller entered the building a second time at approximately 3:12 p.m. through the Senate Wing Door. Miller and Duong remained near the Senate Wing Door, taking pictures on their phones, before police pushed them out around roughly three and a half minutes later. Altogether, Miller and Duong were inside the building for under ten minutes.



*Image 7: Duong and Mille re-entered the Capitol through the Senate Wing Door*

*Duong's and Miller's FBI Interviews*

Miller agreed to be interviewed by FBI agents before her arrest. In the interview, Miller identified herself in photos inside the U.S. Capitol building, and later provided agents with copies of the videos that she took on her phone on January 6, 2021.

Miller recounted that she and Duong had taken a week-long vacation and drove to Virginia around January 4, 2021. She stated that neither had prior intentions to attend the "Stop the Steal" rally, but that they decided to attend after learning about the event from others in the hotel. Miller admitted to seeing a line of officers blocking off the entrance to the Capitol, pepper spray in the air, and she admitted to seeing vandalism inside the Parliamentarian's office suite.

During the interview, Miller lied about the decision to enter the Capitol building. She claimed to have been pushed by the momentum of the crowd into the building and stated that she at one point wanted to leave, but the crowd size was too overwhelming. She did not explain why she chose to enter a second time. Minimizing her actions, Miller stated that she had nothing to hide, and because she had not personally engaged in vandalism, she had done nothing wrong.

Duong also agreed to interviewed by FBI agents before his arrest. Duong corroborated information previously provided by Miller, including that the two had traveled to Virginia as part of a road trip, neither had prior plans to attend the rally, and both decided to go into D.C. after learning about the rally from others in the hotel. Duong commented on the vandalism of the rioters, including those he observed ripping objects off walls and rummaging through drawers in the Parliamentarian's office suite. Similar to Miller, Duong lied about the decision to enter the U.S. Capitol, claiming that he could not turn back down the set of stairs that led to the Capitol due to the crowd, and that he was at some point stuck inside the Capitol building due to the size of the crowd.

### III.     The Charges and Plea Agreement

On June 12, 2023, the United States charged Miller and Duong by criminal complaint with violating 18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds; 18 U.S.C. § 1752(a)(2), Disorderly and Disruptive Conduct in a Restricted Building or Grounds; 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct in a Capitol Building or Grounds; and 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. On June 15, 2023, law enforcement officers arrested Duong and Miller in Worcester, Massachusetts. ECF No. 5 & 6. On July 7, 2023, the United States charged Miller and Duong by Information with the same violations. ECF No. 7. On November 7, 2023, Duong and Miller both entered pleas of guilty to

violating 18 U.S.C. § 1752 (a)(1).  ECF No. 23, 24.  By plea agreement, Miller and Duong agreed to each pay $500 in restitution to the Architect of the Capitol.  ECF. No. 23, 24 at 12.

### IV.     Statutory Penalties

Miller and Duong now face sentencing on a single count of violating 18 U.S.C. § 1752(a)(1).  As noted by the plea agreement and the U.S. Probation Office, Duong and Miller face up to one year of imprisonment and a fine of up to $100,000.  They must also pay restitution under the terms of their plea agreements.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.  The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | <u>-2</u> |
| Total Adjusted Offense Level | 4 |

*See* Duong PSR at ¶¶ 33-43 and Miller PSR at ¶¶ 31-41.

*Application of U.S.S.G. § 4C1.1 for Miller and Duong*

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who

8

have no criminal history points and who meet certain additional criteria. Section 4C1.1 will be in effect at the time of sentencing in this matter but was not considered at the time the parties entered into the plea agreement.

As stated in the PSR, Section 4C1.1 does not apply to Duong. To qualify for the adjustment as a Zero Point Offender, Duong must not have any criminal history points under Chapter 4. Duong has an extended criminal history and received criminal history points for an assault and battery conviction in 2013 and a DUI conviction in 2014. *See* Duong PSR at ¶¶ 42, 51-52.

While the government concedes that Section 4C1.1 applies to Miller, who unlike Duong does not have criminal history points, the Court should vary upward by two levels to account for the reduction under 4C1.1. An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions"). Thus the defendants' conduct caused a significant disruption to a vital governmental function, warranting an upward variance. *See United*

9

*States v. Eicher*, No. 22-cr-038 (BAH), Sentc'g Hrg. Tr. at 48 (varying upward by two levels to offset the Section 4C1.1 reduction).

The U.S. Probation Office calculated Duong's criminal history as a Category II. PSR at ¶ 53. Accordingly, the U.S. Probation Office calculated Duong's total adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment range at 0 to 6 months. PSR at ¶ 101. In the plea agreement, the government, in error, did not calculate any criminal history points for Duong's 2013 conviction for assault and battery or his 2014 conviction for operating under the influence. The government agrees with the U.S. Probation Office that the correct criminal history category for Duong is Category II. Nonetheless, the change in the criminal history category does not change the plea agreement's agreed-upon Guidelines' calculation of 0-6 months that mirrors the U.S. Probation Office's calculation.

The U.S. Probation Office calculated Miller's criminal history as a Category I. Miller PSR at ¶ 44. Accordingly, the U.S. Probation Office calculated Miller's total adjusted offense level, after acceptance and application of §4C1.1(a) at 2, and her corresponding Guidelines imprisonment range at 0 to 6 months. PSR at ¶ 94. Miller's plea agreement contains an agreed-upon Guidelines' calculation that largely follows the U.S. Probation Office's calculation, although the plea agreement does not address a two-level decrease under U.S.S.G. § 4C1.1.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a

backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

### *Immigration Consequences of Conviction*

Duong and Miller are citizens of Vietnam. Miller has permanent resident status in the United States. Miller PSR at ¶ 50. Duong does not have permanent resident status, and a final order of removal was issued for him on January 7, 2015. Duong PSR at ¶ 65. A violation of 18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds, is similar to a crime of trespass. The defendants' violations of conviction in this case are not crimes of moral turpitude that would make them inadmissible under the Immigration & Nationality Act § 212(a)(2)(A)(i)(1).

### **The Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of sentences of 60 days of incarceration and $500 in restitution for Duong, and 14 days of incarceration and $500 in restitution for Miller.

### **A. The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy. *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Miller's and Duong's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for misdemeanor defendants like Duong and Miller,

11

the absence of violent or destructive acts is not a mitigating factor. Had they engaged in such conduct, they would have faced additional criminal charges.

The government credits Duong's and Miller's accounts that, unlike most January 6 defendants, they had no prior plans to participate in a riot or enter the Capitol building, and this has been factored into the government's sentencing recommendations. However, one of the most important factors in Miller's and Duong's case was their willingness to disregard warning signs that they should not enter the Capitol, and having made the decision to join the mob, look on as rioters ransacked a private office space. Both observed the destruction wrought by the rioters in the Parliamentarian's office suite, but neither took the intrusion seriously. Despite witnessing rioters tearing objects off of walls and ransacking desks, Miller and Duong took photographs and videos as souvenirs, including a video of Miller as she posed in a desk chair. Both only left that private office after they were physically removed by police. Undeterred, they chose to re-enter the Capitol just minutes later.

### B. The History and Characteristics of Miller and Duong

Both Duong and Miller are uniquely situated from most January 6 defendants. Both are citizens of Vietnam, and neither has the attained right to vote in U.S. federal elections. Neither appeared to be previously active in U.S. politics; it is unclear what drove them to become eager participants in the January 6 attack to undermine U.S. democracy and the peaceful transition power.

Duong was born in Vietnam and claims to be the son of a U.S. military servicemember who he never met. Duong PSR ¶ 59. Duong had an indisputably difficult upbringing in Vietnam until moving to the United States in 1985 at the age of 16. Soon after moving to the U.S., at age 17, Duong was arrested and convicted of assault & battery with a dangerous weapon, kidnapping,

and manslaughter.  Duong's entry into the criminal justice system as a minor began a long and extended criminal history as an adult, including the following convictions:

- 09/14/1994, Framingham Court, MA; convictions: (1) possession of burglary tools; (2) breaking & entering at night; and (3) larceny.  Sentenced imposed: 90 days' custody on all counts.

- 8/26/1998, Westborough District Court, MA; convictions: (1) assault & battery with a dangerous weapon; (2) breaking & entering at night; and (3) larceny.  Sentenced imposed: 6 months' custody on all counts.

- 03/14/2000, Worcester District Court, MA; convictions: (1) possession of a Class A controlled substance; and two counts of possession of a hypodermic needle or syringe.  Sentenced imposed: probation.

- 01/28/2000, Worcester District Court, MA; convictions: (1) shoplifting.  Sentenced imposed: $125 fine

- 03/20/2013, Worcester District Court, MA: convictions: (1) assault & battery.  Sentenced imposed: probation.  Probation was terminated on 09/24/2014 for a probation violation.

- 11/10/2014, Worcester District Court, MA: conviction: operating under the influence of liquor or .08% blood alcohol content.  Sentenced imposed: probation.  Probation terminated on 02/25/2016 after a two violation notices were issued.

Defense counsel has provided information to the government that Duong has low intellectual functioning, and the government does not dispute this information.

Unlike Duong, Miller does not have any criminal convictions.  She was arrested on assault & battery charges in 2010 during a domestic violence incident, and that case was later dismissed.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the

presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think

that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Duong and Miller have accepted responsibility for their conduct by pleading guilty in this case.  Nonetheless, specific deterrence is necessary.  On January 6, Miller and Duong repeatedly made unlawful choices and ignored the many warning signs that they should not join rioters who ransacked the Capitol building.  They heard rioters chanting and cheering when Senate Fire Door was breached, but they continued on undeterred.  Even after seeing that rioters had destroyed the Parliamentarian's office space, they leisurely meandered through that space, taking photographs and videos as souvenirs.  After being pushed out of the Capitol by police, they entered a second time.  A term of incarceration is necessary to encourage both to abide by the law.

Specific deterrence is particularly necessary for Duong, who has an extensive criminal history and established pattern of recidivism.  Duong's criminal history, which has included significant periods of incarceration (including as a minor), should have equipped him with the experience and knowledge that his conduct on January 6 was unlawful.  Instead of taking care to abide by the law, Duong watched rioters break into the U.S. Capitol building, and then he followed them inside.  While the government does not dispute that Duong has low overall intellectual functioning, the government has no confidence that Duong will choose to abide by the law in the future absent a period of incarceration in this case so as to encourage future lawful behavior.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[1]  This Court must sentence Miller and Duong based on their own conduct and relevant characteristics, but should give substantial weight to the context of their unlawful conduct: their participation in the January 6 riot.  The government submits that Duong's significant criminal history should also factor in heavily in his sentence.

Miller and Duong have pleaded guilty to the Information charging them with violating 18 U.S.C. § 1752(a)(1).  The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.  While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.  The government submits that Duong's criminal history and his risk of recidivism warrant a longer sentence than Miller.

---

[1] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

16

*Comparator Cases for Julie Miller*

In *United States v. Matthew Buckler*, 22-cr-00162 (TNM), the defendant pled guilty to a misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) in connection with penetrating the Capitol building twice, first through the Parliamentarian Door and then through a broken-out window near the Senate Wing door.  Like Miller, Buckler entered a private office space (in Buckler's case, Senator Merkley's side office).  Similar to Miller, Buckler minimized his involvement and personal agency in the decision to participate in the January 6 riot.  Judge McFadden sentenced Buckler to 14 days of home incarceration as a condition of 24 months of probation, and  $500 in restitution.

Another comparable case is *United States v. Quick*, 21-CR-201 (DLF).  Stephen and Michael Quick pleaded guilty to 40 U.S.C. 5104(e)(2)(G).  Similar to Miller, the Quicks were aware of the likelihood of violence as they stood outside of the Senate Wing Door while the crowd chanted.  The Quicks were inside of the Capitol for less than 20 minutes and cooperated immediately with the FBI.  The Quicks, like Miller, had minimal criminal history.  This Court sentenced the Quicks to 24 months of probation and a fine of $1000.

The Court may also consider the sentence imposed in *United States v. Jon Heneghan and Carol Kicinski*, 22-cr-61 (RBW), who both pleaded guilty to violating 18 U.S.C. § 1752(a)(1) and were both sentenced to 20 days of incarceration and one year of supervised release.  Both Heneghan and Kicinski spent approximately 20 minutes inside the Capitol on January 6 (slightly longer than Miller and Duong).  Heneghan and Kicinski also entered a sensitive area—the Speaker's Suite.  Heneghan filmed violence against police officers while he was inside the Capitol; Miller filmed videos of the breach and the destruction of the Parliamentarian's office suite as

souvenirs.  Unlike Miller, Kicinski celebrated the political violence and the actions of the rioters after January 6.

*Comparators for Duong*

For Duong, a comparable case is *United States v. James Bonet*, 21-cr-00121 (EGS), who also pled guilty to a violation of 18 U.S.C. § 1752(a)(1).  Similar to Duong, Bonet entered the Capitol through the Senate Wing door area and also entered a private office space (Senator Jeff Merkley's office).  Bonet posted on social media and also smoked a joint in Senator Merkley's office (both of which Duong did not do).  Judge Sullivan sentenced Bonet to 90 days of incarceration, twelve months of supervised release and 200 hours of community service.  Bonet's criminal history, like Duong's, was also calculated by the U.S. Probation Office as Category II.  Whereas Bonet's two prior criminal convictions were for marijuana possession, Duong has a history of convictions for more serious crimes of violence.

In *United States v. Kasey Hopkins*, 22-cr-317 (TSC), the defendant pleaded guilty to a violation of 40 U.S.C. § 5104(e)(2)(G).  Both Hopkins and Duong entered the U.S. Capitol building twice, and both minimized their conduct in interviews with the FBI.  Both Duong and Hopkins entered the Parliamentarian's office suite, and Hopkins also entered Senator Merkley's private hideaway office.  Hopkins and Duong both have significant criminal histories and a demonstrated inability to abide by the law.  Whereas Duong had multiple felony convictions, Hopkins had a 2002 conviction for rape.  Judge Chutkan sentenced Hopkins to 4 months of incarceration, largely based on Hopkins' criminal history.  Duong, unlike Hopkins, does have a diagnosis of low overall intellectual functioning.

**V.      Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Duong to 60 days of incarceration and Miller to 14 days of incarceration, both sentences to be followed by one year of supervised release. Both should also pay $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Duong's and Miller's liberty as a consequence of their behavior.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   */s/ Melanie Krebs-Pilotti*
Melanie Krebs-Pilotti
Trial Attorney- Antitrust Division
Cal Bar. No. 241484
601 D St., NW
Washington, D.C. 20001
melanie.krebs-pilotti2@usdoj.gov
(202) 870-7457